# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

### UNITED STATES v. CARTER et al.

#### (Circuit Court of Appeals, Seventh Circuit. March 18, 1909.)

#### Nos. 1,534, 1,535.

1. TRUSTS (§ 110*)—CONSTRUCTIVE TRUSTS—FRAUDULENT ACQUISITION OF PROPERTY—EVIDENCE TO ESTABLISH—COLLUSION BETWEEN UNITED STATES OFFICER AND CONTRACTORS.

One of the defendants, as local engineer officer of the United States in charge of river and harbor improvements at and near Savannah, Ga., prepared the specifications on which a contract was let for work involving an estimated expenditure of $3,000,000. The contract provided for alternative methods of construction of certain of the work, to be designated by the engineer in charge, each kind of work to be paid for at prices fixed by the contract. One method of construction, which proved extremely profitable to the contractors, was adopted by the engineer to a far greater extent than was contemplated by the contract, and afterwards he let other contracts to the same contractors on similar terms and designated thereunder the same method of construction; the result being that the government paid far in excess of a legitimate price for such work, and was defrauded in a sum approximating $2,000,000. It was also shown that during the five years the work was in progress such profits were from time to time, as payments were made, divided in New York City; one-third being paid to the engineer's father-in-law, by whom they were subsequently practically all transferred to him. *Held,* that the circumstantial evidence was sufficient to establish his connection with the fraud, if not in the original letting of the first contract, in making others after his experience and ability as an engineer must have given him knowledge of the excessive prices being paid, and that the United States was entitled in equity to follow and recover the proceeds of such fraud which passed into his hands, into whatever investments they could be traced, as a trust fund held for its benefit.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 160; Dec. Dig. § 110.*]

2. TRUSTS (§ 374*)—CONSTRUCTIVE TRUSTS—ENFORCEMENT—TRUST PROPERTY MINGLED WITH PROPERTY OF TRUSTEE.

It appearing that such defendant had mingled property and securities purchased with money so fraudulently obtained with property and se-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

172 F.—1

curities purchased with other money, and secreted and claimed title to the whole as an entirety, personal expenditures made by him from the mass should be charged against the portion which was his own, and all remaining held subject to the trust, and for any deficiency the United States is entitled to a personal judgment.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 607; Dec. Dig. § 374.*]

**3.** TRUSTS (§ 356*)—CONSTRUCTIVE TRUSTS—TRUST PROPERTY TRANSFERRED TO THIRD PERSONS—RIGHT TO FOLLOW AND ACCOUNTING.

Where a defendant, who had obtained large sums of money from the United States by fraud, invested the same in securities which he subsequently transferred to his codefendants, who, with knowledge of the source from which they were derived and the charges of fraud by the United States, received and concealed the same until compelled to surrender them to the court at suit of the government, such codefendants are accountable for the value of any of the securities so received and not produced, and are not entitled to a deduction therefrom on account of salaries agreed to be paid them for their services in caring for the property.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 537; Dec. Dig. § 356.*]

Appeal and Cross-Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

The appellant, United States, is complainant in a bill filed in the trial court against Oberlin M. Carter, as principal defendant, with Lorenzo D. Carter, I. Stanton Carter, and another impleaded as defendants for subsidiary relief, charging (in effect) fraudulent conduct and conspiracy with persons named as contractors, on the part of Oberlin M. Carter, while serving as engineer officer of the army in local charge of harbor improvements and disbursements therefor in the Savannah district of Georgia, whereby the United States was defrauded in the letting of contracts and payments from the public funds of exorbitant rates and amounts, aggregating $2,000,000 in excess of the fair value of work performed; that the illicit proceeds and profits of such transactions were divided between the contractors and such defendant, or for his benefit; that such shares therein of the defendant were largely invested by him or for his benefit in real estate and securities, which came to his possession; that portions thereof have been traced and are impounded in other courts under like bills, and other portions are believed to be secreted; and that the other defendants named are secreting and holding in trust for him portions of such investments. This bill was filed as ancillary to other bills therein referred to, but was ultimately adopted under stipulation as the primary case for trial. Upon final hearing of the issues joined (after various proceedings impounding property in controversy as proceeds of the alleged transactions), the decree of the trial court was entered in two parts—one entered March 21, and the other April 14, 1908—and the United States appeals from both decrees.

The main decree is that of March 21st, which adjudges in substance: (a) That all moneys arising from profits made by the contractors, "described in the bill and auxiliary bills," constitute a trust fund in favor of the United States, together with the investments and income thereof, and belong to the United States, and not to the defendant Oberlin M. Carter; (b) that certain securities impounded in the hands of receivers were not purchased with such trust fund, and belong to such defendant; (c) that the other securities and property described "are traced from and held to be investments" arising from such trust fund (aggregating, "at cost or proceeds," $367,822.71), and adjudged to be the property of the United States; (d) that deficiency decree against L. D. Carter is denied; (e) that deficiency decree is denied against O. M. Carter for proceeds of such trust fund dissipated prior to November 6, 1901, the date of a stipulation entered into between the parties to this suit; (f) that the

United States recover of I. Stanton Carter $11.454.18 for an amount of the trust fund received by him and not accounted for. Other provisions of the decree do not require mention, except that matters of allowances to be made were reserved to be passed upon at the foot of the decree. The decree of April 14th awards allowances out of the fund, and, in so far as error is assigned thereupon, the provisions are sufficiently described in the ensuing opinion. Cross-appeals are taken on behalf of Oberlin M. Carter and each of the other parties named in the title in respect of provisions affecting them severally.

The testimony upon which the cause was heard and decided in the trial court makes a printed and exhibit record, referred to in the opinion below as containing over 50,000 pages, which is burdensome in its volume and contradictory in a multitude of details. Many of the printed volumes, under stipulations of the parties for their reception of evidence, embrace full reports of testimony and proceedings in other cases or hearings, in reference to the transactions in controversy, namely: (1) In a court-martial record, upon trial of the defendant Oberlin M. Carter, under War Department order of December 2, 1897; (2) in the record of a board of inquiry of 1897; (3) in a proceeding before Commissioner Shields, in New York, for arrest and removal of the contractors mentioned in the bill, for trial under indictments in the Georgia district. As the hearing of the issues was not referred to a master, except upon one issue relating to investments averred in the bill, the trial court received this mass of testimony in the various forms of submission—including examination in open court, examiners' reports of testimony, and matters stipulated in evidence—for determination of all questions of fact, as well as law, in controversy under the pleadings. No special findings upon the ultimate facts thus involved (aside from the master's report upon the above-mentioned subsidiary issue) appear in the record, and the only aid which is furnished to that end, for the purpose of review, appears in the references to the testimony and conclusions of fact stated in two written opinions filed by the trial judge —one filed January 9, 1908, and the other March 17, 1908—both made part of the record by an order entered April 14, 1908, when the decree was completed. For brevity, these recitals in the main opinion referred to (of January 9th) are thus summarized:

The transactions in controversy were for harbor improvements made by the United States in the Savannah river and contiguous places within the "Savannah district," placed in charge of Capt. Oberlin M. Carter. Capt. Carter entered upon this charge in 1885, under Gen. Gilmore, as chief engineer, continuing therein until the death of Gen. Gilmore in 1888, when Gen. Craighill became his superior; and Capt. Carter thus remained in local charge until relieved in July, 1897, by Capt. Gillette, when he voluntarily retired for other service. Prior to 1892 Capt. Carter had been quite intimate with Messrs. Greene and Gaynor, who became contractors for harbor work, as hereinafter referred to, and had contemplated at times private business relations with them. Of the several contracts for work in controversy, the opinion expressly mentions two, one let October 22, 1892, for expenditures estimated at $3,000,000 in the Savannah river, and the other of October 8, 1896, for improvements in Cumberland Sound, involving $2,000,000. Referring to the method of advertising adopted by Capt. Carter for letting these contracts, the opinion refers to the testimony of the various officers called in reference to the usual time for such advertising, and concludes that there was no departure "from the usual course obtaining in like case," and that there was "nothing inherent in the matter of notice which suggests any fraudulent intent." The specifications called for three different styles of mats to be employed in the work in quantities to be fixed by the engineer in charge. Mat No. 1 was composed of logs laid parallel to each other, fastened together, and covered with several inches of brush, and then bound together by poles to the required dimensions. No. 2 consisted of artificial logs, made of brush bundles (fascines), laid in alignment, tightly bound and choked at regular intervals, placed side by side, as in No. 1. Across these were placed transversely long brush logs, one on each edge and one down the middle, and all bound together by grillage poles. No. 3 consisted of brush logs firmly united by grillage poles as in No. 2, but lacking the transverse brush logs, with double sets of gril-

lage poles, however. In performance of the work this design No. 3 was employed throughout, and the complainant contends that this was much cheaper to construct, and that, by reason of an understanding between the contractors and Carter that No. 3 should be used, the contractors—Greene and Gaynor, operating under the name of the Atlantic Contracting Company—were able to underbid other contractors and so obtained the contracts.

The opinion reviews the testimony of various witnesses upon the question of difference in cost, and concludes that there was "nothing unusual or improper in Carter's action in treating the case of the three designs as practically the same, when considered with reference to the fact that different kinds of work might require different designs on the same contract"; that "of itself it discloses no evidence of a conspiracy to defraud, nor does it tend so to do." The contention of the government that Carter embarrassed other bidders by this method of including the three designs as of one price is, in effect, stated to be unsupported by evidence. In reference to contentions that Carter discouraged other bidders by refusing to furnish specifications, or sending one copy only when three were required, and other complaints mentioned, the opinion states that several mistakes do appear, but not any "sinister motive" therein, and that nothing appears in evidence upon the opening and letting of bids "calculated to cast suspicion upon Carter's conduct."

The contract of 1892 for Savannah river work, and other subsequent contracts referred to, called for bids for mats by the square yard, and it is contended that prior to these transactions "mats had always been purchased by the cubic yard"; but it is stated that this is not supported by the evidence, and that like terms appear in numerous instances of prior contracts, and that no reason appears why "this class of work should not have been dealt with by the square yard," and that fraud can appear only in the price paid or the character of work accepted thereunder. "Substantially all the fascines used in the several improvements under consideration were made up into mats. These fascines are required by the specifications to 'be made of live brush of cedar, water oak, myrtle, sweet gum, or any other variety of wood approved by the engineer officer in charge. The fascines will be from twelve (12) to one hundred (100) feet in length [contract of 1892, and 30 to 100 feet in contract of 1896], and must be compressed tightly by an approved form of choker to a diameter of 9 inches at intervals of two (2) feet, where they must be bound firmly with wire or tarred rope of approved strength. The brush used shall be as straight and well trimmed as can be obtained. The fascines shall be carefully and thoroughly made and handled with care. They shall be piled on shore or on barges for measurement in such way as the engineer officer in charge may direct.'"

The contract of 1892 assumed the quantities of different materials to be used as: Square yards of mattresses, 350,000; cubic yards of fascines, 300,000; sawn timber (feet), 800,000; riprap stone, cubic yards, 200,000. "Under the power reserved in the contract, authorizing the engineer to vary the relative amount of each, Carter increased the amount of mattresses to 1,363,572 square yards, to the practical exclusion of the other materials above enumerated. He was thus able to keep within the estimate of the cost of the whole and within the appropriation, while at the same time he accomplished the results sought for. Conceding the power of the engineer in charge to make such a radical change, some of the expert witnesses were of the opinion that the proposed change should have been submitted to the War Office for approval, in view of its radical nature. For defendant it is insisted that the frequent reports showing the progress of the work advised the department of what was being done, which was all that was required. It is not denied that the substitution appears fully in these reports. In and of itself no improper motive can be deduced on Carter's part from his course in this respect. The failure of the department to call attention to the change might fairly be assumed to indicate approval."

"The specifications provide that the third design mattress—i. e., the one actually used—'will consist of a bottom grillage of poles of live saplings, of pine or other timber of a kind approved by the engineer officer in charge. The pole must be straight, of slight taper, of an average diameter of from four (4) to five (5) inches, and not less than three (3) inches at the small end,

and must be placed from four (4) to eight (8) feet apart between centers, both longitudinally and transversely, and spliced together with long scarf joints in a manner satisfactory to the engineer officer in charge. Upon the grillage will be placed a layer of closely compacted fascines, surmounted by a top grillage similar in design to the one at the bottom. The poles of each grillage will be securely fastened together by suitable wire or rope lashings, and the upper and lower grillages will also be securely fastened together in such manner as the engineer officer in charge may approve.' It is further provided therein that: 'The size of the mattresses will be fixed by the engineer officer in charge from time to time. In general they will be from twenty (20) to one hundred (100) feet in width, have such lengths as may be convenient for handling,' etc. It is also provided therein that: 'As a general rule all material will be measured by the engineer officer in charge, or his representative, after their arrival upon the ground, and just before being placed in the work. The mattresses may also be inspected as made.'"

The bid of Greene & Gaynor for mattresses per square yard was 95 cents, and for fascines per cubic yard $1.60, and the government contends that the fascines should have been procured and measured by the cubic yard, and when required made into mats without additional cost, as shown in prior contracts, where it appears, however, "that the amount of mattresses required was nominal." It appears from the evidence that, while small quantities of brush fascines can be readily obtained in most localities, "large quantities are hard to get," and the testimony of Capt. Carter is accepted that it would take about nine of the fascines made from the brush found on that coast and "choked to nine inches and one yard long to make a cubic yard," while "the same fascines put into the form of a brush mattress would compress so that four to the square yard would be required, and when subjected to the pressure and weight of an eight-course multiple mattress it would take six fascines to make a square yard, as against nine in a cubic yard, or perhaps ten," so each square yard would require six-tenths of a cubic yard of fascines, or 96 cents, and with grillage poles added the cost of one square yard of fascines in multiple form mat would thus amount to $1.19.

In September, 1893, the contractors began under the 1892 contract to construct what are termed multiple mats or mattresses, for which no provision was made in the contracts, specifically. These "consist of one mattress imposed upon another, varying from 2 to as many as 16, according to the needs of the construction. They were built upon the deck of a barge, especially prepared for the purpose, with facilities for sliding them from the deck into the positions desired. It is claimed by Carter, and seems to be conceded, that this method of planting the brush mats was found to be very desirable, in order to prevent the undermining which preceded the laying of single mattresses or stone work. The scouring produced by the resistance of the single stone-loaded mats to the currents had a tendency to cause the currents to work around the outer end of the single mat and stone work and undermine it. By the use of the multiple mats the construction proceeded so rapidly and so affected the currents as to prevent the bottom wash, whereby a more even foundation and other good results were obtained. In addition, it seems the single mat, when separately loaded with stone for ballast, was apt to sink into the soft bottom of the river, sometimes to the depth of 70 feet. By the use of multiple mats, it was possible to sink eight courses of mattresses with the same amount of stone as is required by the specification in sinking one mattress. Thus seven courses of stone were saved, while at the same time the construction was laid rapidly and made less liable to sink into the muddy and sandy bottom of the river. To build these multiple mattresses without making the openings between the different layers too large, the double grillage was omitted from all the mattresses except the lower side of the lower mattress and the top of the upper mattress. There would be only a half grillage between the intermediate tiers of fascines. The multiple mat was firmly bound together with wire and by other prescribed methods, so that the whole formed a compact body of large dimensions, often 100 and more feet wide and 50 feet long, weighing sometimes 200 tons. The barge was then towed out to the place where the mat was to be placed, and by means of a lowering adjustment, located on the side of the barge next to the

destined place, the mat was slid off into the water and into position. and weighed with stone sufficient to sink it and hold it in place. Complainant insists that thus a large saving was made to the contractors both in material and labor, in that they were saved the trouble of planting each mattress separately and the cost of the unused grillage poles. The saving in stone accrued to the government, except so far as it was otherwise expended, more particularly in paying for the extra fascine work. The use of multiple mats on the Savannah river work is warmly approved by most of the experts and is fully justified by the evidence. It is also clear that for the purposes of that work it was desirable that the grillages be made single, except at the bottom and on the top of the multiple mattress." After recapitulation of the conflicting testimony as to the advantages of this plan of multiple mattresses, the opinion states that "there seems to be little ground for questioning the good judgment and skill of the engineer in charge in causing the mats to be put together and used in the multiple form, nor is it apparent that there was anything suspicious in his not insisting on a reduction in price per square yard for mats laid in multiple form, as against individual mats, provided they came up to the specifications."

The opinion comments on the want of specific testimony from which "to ascertain just what was the construction of the mattresses, multiple and single, under the 1892 contract," but that it seems to be conceded that they were substantially like those in evidence under the 1896 contract, except that "they contained something more of grillage." The government's contentions in respect thereof are then stated in substance: (1) That they were accepted "in lengths varying from 12 to 18 feet, instead of 12 to 100 feet, as required under the 1892 contract, and 30 to 100 feet, as required under the 1896 contract, according to Carter, to facilitate hauling from camp to barge, saving to contractor 25 per cent. of cost"; (2) that they were not well trimmed; (3) did not contain the quantity and quality of material required: and (4) were not arranged and tied according to the specification. The opinion states that the provision of design No. 2 that brush is to be "carefully laid in the fascines so as to break joints and to make a continuous fascine, extending completely across the mattress," is not expressed in the specification of design No. 3 used by Carter in this work, but "that no reason appears under the evidence why it should not be required in one as well as the other, and it does appear that fascines 100 feet long were difficult to transport from the camp to the barge." No continuous fascines were required by Carter, and he claims that the work was thereby hastened without injury to the government; nor does it appear that continuous fascines "added anything to the merits of the mats." Allowance, therefore, of the short fascines, is not deemed such departure from the contract as would authorize the engineer to require the contractor to reduce the price therefor, and, while the latitude thus left with the engineer "might easily be abused," it is not "per se evidence of a misuse of it to waive the more expensive construction when no disadvantage would thereby accrue to the work in hand." The contract provided that "the brush used should be as straight and well trimmed as can be obtained," and the question is discussed whether this provision intends what are known as "military fascines," consisting of "trimmed rods or poles so bound together as to constitute a compact bundle," or the ordinary fascines made of live brush mentioned in another part of the contract; and considerable of the testimony is reviewed in reference to such contention, with the deduction that the evidence does not sustain the contention that military fascines were intended.

Upon the contention, however, that the fascines furnished under the 1892 contract were not well trimmed, so that the bulk was increased for measurement, while the mattress was not made "sufficiently solid" for the work, the conflicting evidence is referred to with this conclusion stated: "The evidence leaves the court with the impression that there was carelessness in the manner in which some of the work was done, indeed carelessness for which Carter was justly entitled to be criticised; but considering the material results, the magnitude of the work, and assuming the absence of any mercenary or any other ulterior motive on Carter's part, except such as might justly be deduced from the facts so considered, * * * Carter's course in the premises was not necessarily in abuse of the discretion vested in him, nor seri-

ously inconsistent with his claim that he discharged his duty to the government, so that the government has failed to maintain its case" in this particular. Comment is also made in reference to the numerous eminent engineers testifying in favor of the work as constructed that "it is an impressive fact in this case that the defendant is so emphatically indorsed by these men, who are above suspicion." The opinion proceeds, however, to consideration of the circumstantial evidence offered by the government as tending to support the charge of fraudulent conduct on the part of Carter in the letting of these contracts and acceptance of work thereunder, namely: The great volume of evidence introduced in support of the charge that the profits thus realized by the contractors were divided between such contractors and one Westcott, the father-in-law of Carter, and were paid over for the benefit of Carter, and invested in real estate and securities which are now traced to Carter's possession, exceeding $400,000 in amount.

After commenting on the "ingenuity and patience" on the part of the complainant, which had resulted in tracing the actual divisions of the amounts paid to the contractors month by month to the bank account of R. F. Westcott, together with proof of the investment of like amounts in various securities and real estate from time to time and of subsequent transfer thereof by Westcott to Carter, and that such facts are so well established that they are substantially uncontroverted by counsel for Carter, except in reference to certain of the securities which are claimed to have arisen from other sources, and then referring to the contentions of Carter that such divisions and sources of the investments were unknown to him and not even suspected, and the securities were received by him upon the understanding that they were a gift for reasons stated, the opinion remarks that "there is no legal presumption here that Carter knew what was going on and had been a party to it," but that, nevertheless, the burden was cast upon him to explain "very many items shown in the accounts in evidence." It then states that the transactions in suit "cover the period from December, 1891, to 1897, during which period a number of contracts were let, and that, even though Carter was not in actual conspiracy with the contractors, yet, if he knew of their vast profits on the prices allowed them on the earlier work, it was his duty to investigate thoroughly the situation and see to it that the government thereafter paid no more than was fair and just. Even negligence under such circumstances would have amounted to fraud. If, therefore, Carter was cognizant of the fact that the contractors were reaping an abnormal profit from the 1892 work, and that Westcott was interested in that profit and was turning it over to him under any kind of a cover as and for his share of said profit, he was false to his trust and should be held liable to make good to the government all the fruits of his fraudulent acts. This, of course, presupposes that such profits, if any, accrued out of fraud upon the government in the matters of letting or accepting the contracts in question, or both. If the government lost nothing by the transaction, there is nothing due to it."

The opinion then concludes as follows: "The evidence discloses a shameful course of treatment of the workmen employed by the contractors in cutting and otherwise handling the brush used in these constructions. They were paid little or nothing over and above their living, and that, too, of the worst. No doubt some shameful part of the profit reaped from these harbor constructions came in this way. How much can never be ascertained; certainly not all of it, nor even, relatively speaking, a considerable portion thereof. It is also claimed that some of the saving to the contractors arose from the fact that they or some of them claimed a patent or patents upon the methods for handling multiple mats. The record discloses no basis upon which to estimate that saving, if, indeed, it resulted in any saving, so that it is without moment at this time. Undoubtedly, constructions of the character now involved afford, when held down to a fair advance on actual cost, little or no inducement to contractors, because of the element of chance growing out of the weather and water conditions. Liberal allowance should, under the evidence, be made to cover such contingencies; but, when all these considerations are borne in mind and given due weight, it is still beyond controversy from the record that a great wrong was practiced upon the government by the contractors. The evidence to be found in the record with regard to the

financial transactions of Carter and Westcott and the contractors, Greene and Gaynor, is both vast and intricate and entirely circumstantial. It has been read and re-read by the court as presented in the briefs and depositions. To recite it here is of no value. Suffice it to say that, without passing directly upon the questions as to whether Carter had actual knowledge of and connived at this raid upon the government, the facts brought out concerning these financial transactions are such that he must, as a conclusion of law, be held chargeable with knowledge of what was being done in the premises. This fact alone makes it clear that the government is entitled to a decree awarding to it each and every of said pieces of property held by the receiver which shall be found to have been purchased directly or indirectly with moneys received by Westcott, or any one else, or in any other way arising from funds made up of profits realized by the contractors under the contracts in suit; and it will be so ordered."

For the purpose of ascertaining the securities in evidence which are thus chargeable as held in trust for the government, and for ultimate decree in respect of all securities impounded in the hands of receivers or otherwise, the hearing was continued, and the second opinion (March 17th) treats of such ascertainment and disposition of the securities with reference to the evidence tracing the origin of the securities; and thereupon the securities were set apart, as mentioned in the decree. The following stipulation, which was entered into between the parties to the bill, pending proceedings on the part of the receiver to obtain possession of securities mentioned in the bill as held by one or the other parties named, is referred to in the decree and becomes material for consideration of various assignments of error, viz.:

"United States of America—ss.

"United States of America v. Oberlin M. Carter et al. In Equity.

"Pending on Bill and Auxiliary Bills in the Circuit Courts for the Southern District of New York, District of New Jersey, Southern District of Georgia, Southern District of West Virginia, Northern District of Illinois, and Southern District of Illinois.

"Agreement.

"It is agreed between the United States, complainants, and Oberlin M. Carter, I. Stanton Carter, and Lorenzo D. Carter, defendants in the above-entitled cause, as follows:

"(1) The issue as between the United States and Oberlin M. Carter as to the fraudulent diversion of funds, intrusted to him as disbursing officer, into the assets as charged in complainant's bill pending in the several districts, shall be brought to final decree first in the Circuit Court of the United States for the Northern District of Illinois, and the final decree of that court, unless reversed by the appropriate appellate court on appeal, shall be conclusive on all questions determined therein, and shall be made effective by appropriate decrees on the bills in the other districts if deemed necessary by either party. But this clause shall not be construed to operate to the prejudice or delay of the government in any proceeding against other parties for accounting in districts other than the Northern district of Illinois, who may be claiming for themselves any part of said assets.

"(2) That as to the assets claimed by the government as assets into which it charges the funds intrusted to Oberlin M. Carter as disbursing officer was diverted, with the proceeds, income, and reinvestments thereof where the form of the investments have been changed, and which assets have or may be hereafter traced into the possession, custody, or control of said defendants, and have not heretofore been bona fide disposed of by them and therefore beyond their control, shall be forthwith by the said defendants turned over to the receiver appointed in this cause. But the court will determine whether the one Kentucky Central bond and one Michigan Telephone bond charged in the bill to be reinvestments of said alleged trust fund, and which bonds are claimed by I. Stanton Carter, should be held by the receiver pending the litigation.

"(3) The said defendants shall waive their privileges and give all the information they can with regard to what property has been disposed of and its disposition, but no evidence which may be given by the said Carters in

this case shall ever be used against them in any criminal proceedings, unless on a charge of perjury committed in this case. And nothing in this agreement shall be construed as affecting the right of the government, if any it has, to recover any part of said assets disposed of by the said defendants and not turned over to the receiver.

"(4) L. D. Carter and I. Stanton Carter will forthwith dismiss their demurrers and file answers disclaiming any personal interest in the aforesaid assets in controversy in this litigation, including the real estate on Eighth avenue, New York, and at Orange, New Jersey, except as to the two bonds claimed by I. S. Carter as above.

"(5) Oberlin M. Carter shall dismiss all demurrers and exceptions and shall file promptly his answers to the bills and amended bills pending in said several districts.

"(6) All private books, papers, etc., of Oberlin M. Carter turned over to the court-martial shall be subject to the inspection of the counsel for said Carter, and his chief counsel shall have the right to have made, at the expense of the fund turned into court, a copy of any documentary evidence which has ever been used or referred to as evidence in the court-martial or Greene-Gaynor proceeding, or in this proceeding.

"(7) From said fund to be accounted for to the receiver the sum of $5,000 shall be left in the hands of H. G. Stone, chief counsel of said Oberlin M. Carter, from which to compensate and cover the expense of employment of local counsel in any of the districts in which local counsel have been or may be employed in any branch of this case.

"(8) From said fund to be accounted for to the receiver, there shall be paid:

"(a) The fees, traveling expenses, and other expenses of Oberlin M. Carter's chief counsel and of his attorney at Chicago, to be fixed and allowed by the court. The importance of the case, and the means and methods taken to bring the same to a just determination speedily, and not the length to which the proceedings may be protracted, to be considered as the elements of merit in fixing such fees.

"(b) Also the fee of his attorney for representing said Carter in case of any criminal trial in Georgia, if Carter should be placed on trial there prior to the final disposition of this case.

"(c) The expenses of taking evidence on behalf of said Carter, including the services of an accountant at not exceeding $10 per day for his services when needed and actually employed, plus his expenses, if any.

"(d) And if before the final determination of this cause the said Oberlin M. Carter shall be liberated from prison, he shall be allowed his reasonable personal expenses incurred by him while engaged in work in this cause, including the taking of evidence but with no compensation for his time. Such expenses to be determined by the court and paid out of the moneys in court.

"Payments and allowances under paragraph numbered '8' of this agreement to be determined by the court from time to time on petition, with the right of the United States to contest the same as unreasonable, or that any expense was not incurred as stated.

"(9) The assent of the United States to paragraphs numbered '1,' '7,' and '8' of this agreement is predicated upon the understanding that the said defendants will turn over to the receiver at least substantially all of the assets turned over to I. Stanton Carter and L. D. Carter, by J. H. Paul and R. E. Westcott and James Bragg, or their proceeds and reinvestments, except such as has been, prior to the receivership, bona fide paid out or pledged by them for attorney's fees or as expenses in defense of Carter, or expended by them legitimately in the handling of said properties, or which has not already been taken possession by receivers in this cause.

"Nov. 6, 1901. United States of America,
"By Marion Erwin, Special Asst. to Attorney General.
"Oberlin M. Carter,
"Lorenzo D. Carter,
"I. Stanton Carter,
"By Horace G. Stone, Their Chief Counsel."

Other facts in evidence, in so far as deemed material for the purposes of review, are mentioned in the ensuing opinion.

Edwin W. Sims, U. S. Atty., and Marion Erwin, Sp. Asst. Atty. Gen. Horace G. Stone and Nathanial C. Sears, for Oberlin M. Carter and others.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

SEAMAN, Circuit Judge (after stating the facts as above). The appeal and cross-appeals for review of the decree (in two parts) entered in this cause raise no questions of law, as we believe, in reference to the primary charge of liability under the bill, which are not elementary and well settled. With no special findings of fact in the record, however—beyond the recitals and deductions stated in the written opinions filed by the trial judge as premise for the decree—solution of the ultimate facts for the purposes of review has involved examination, not only of voluminous abstracts of the testimony contained in the printed arguments, but of many pages of testimony in the record, cited in the above-mentioned opinions and in the arguments of counsel. The basic averments of the bill, of great losses suffered by the United States, through payments made to the contractors, Greene and Gaynor, of prices for their work (furnished under successive contracts) grossly in excess of value, are supported by a mass of evidence, direct and circumstantial, which impresses us to be both sufficient and substantially uncontroverted.

1. In support of the charges against the defendant Oberlin M. Carter of primary liability for conspiring with such contractors to defraud the United States under the several contracts and thus obtaining a share of the illicit proceeds, the charge of fraudulent conduct on his part rests on circumstantial evidence, although the fact is proven and undisputed that he obtained, directly or indirectly, a large share of the profits arising from such contracts. The extent of testimony and multiplicity of facts and circumstances in evidence, upon the issues of conspiracy and the so-called "engineering" features of the case" involved therein, preclude any attempt to analyze the conflicting testimony or make any summary within reasonable limits for an opinion; and we are impressed with no view which requires or justifies extended discussion of this class of testimony. The ultimate facts, however, upon which decision of this issue of primary liability may rightly rest, as we believe, are either uncontroverted facts in evidence, or inevitable deductions from facts well established, to be presently stated.

Under appropriations by the Congress and plans and estimates made by the engineering department for harbor improvements from time to time, in the Savannah district, the United States carried on the work in controversy from 1892 to 1897, with Capt. Carter in local charge as engineer and disbursing officer. Specifications were prepared by Capt. Carter, and upon approval by his superiors in each instance he advertised for bids and let contracts for the work. One of these contracts, made October 22, 1892, comprised expenditures in excess of $3,000,-000, and is the main subject of controversy; while another, made in 1896, amounted to $2,000,000. Capt. Carter was an officer of the army, of exceptional ability both as an engineer of harbor work and for business qualities. The work as carried out under the successive

contracts, aside from dredging, mainly consisted of mattresses or "mats," made of brush fascines united by grillage poles; and all contracts for this class of work were (directly or indirectly) let to the Atlantic Contracting Company, as the lowest bidders, with all operations performed by Greene and the Gaynors, composing that corporation, who had long sustained relations of intimacy with Capt. Carter. Such discretion as was vested in the engineer in local charge, under department regulations, was exercised to employ this mattress structure for the major part of the work, instead of timber or stone work (included in the specifications and authorized under the contract), and as well, instead, of dredging specified; so that, under the contract of 1892, brush mattresses were used to the amount of 1,363,372.36 square yards, instead of 350,000 square yards, estimated in the specifications and contract; and this aggregate was kept within the appropriation by omitting other work specified. In reference to this undisputed fact of substitution and increase of mattress work, explanations appear in the testimony that it was found to be advantageous for harbor improvement, and its efficiency is upheld by the concurring opinions of many eminent engineers who testify thereupon; so the foregoing statement is not to be understood as intimating doubt, either of authority to make such changes in the interest of the government, or that such substitutions were not effective for a great work in the improvement of harbors. The extension of the contract rates of 1892, however, to include the large increase of mattresses, measured by the square yard—which were made by the contractors in so-called "multiple mats," in courses of 2 to 16 in number, thus built up on the barges, towed to the work, and launched in place, each course being measured for payment—together with continuance of like general specifications and estimates, in each subsequent call for bids and letting of contracts, are obviously entitled to consideration as circumstantial evidence upon the issues of fact, when linked with the above-mentioned fact of abnormal profits thus realized by the contractors, and other circumstances in evidence.

These further general facts are established by the evidence and not controverted: The contracts which are directly involved in the controversy were let to and performed by Greene and Gaynor (as the principal contracting parties) during the years 1892, 1893, 1894, and 1895, and work was paid for by disbursement checks issued by Capt. Carter periodically at Savannah. Upon receipt of the checks it was customary for Greene or Gaynor, or both, to visit New York, where their principal bank account was kept, and the proceeds of checks not used at Savannah for payments upon the work were there divided between the contractors and a third party—R. F. Westcott, who was the father-in-law of Capt. Carter, residing in New York, retired from active business, with large means, and not engaged in the transactions in any manner disclosed by the evidence, aside from such sharing in the proceeds. Discovery of these divisions and of innumerable details in evidence involved great skill and patient research through various bank accounts, books of account, checks, and other vouchers; but the proof is clear, both of the facts of division and of the actual amounts turned over—usually found in Westcott's account, but instances appear of corresponding amount deposited by Carter—and after 1892 the

shares are identified as exactly one-third of the entire proceeds retained in New York, presumably profits under the contracts. This line of proof states the aggregate of payments made to the contractors under the successive contracts (prior to the 1896 contract) to be $2,567,-493.18, while the proceeds thus divided into three shares aggregate $1,815,941.62.

Investments in securities are traced which approximate in date and amount the receipts from these divisions, in numerous instances, and coming to the possession, first of Westcott and then of Carter, aside from occasional instances, contrariwise, but ultimately reaching the hands of Capt. Carter, mainly through a transfer made by Westcott, on October 29, 1897, of securities aggregating over $400,000 in amount, for which Carter's receipt is in evidence and undisputed. The search for these transactions extended to many localities, through numerous entanglements, and the only disputes arising are upon various details of specific identity and course, which leave uncontroverted the systematic disposition above stated. Abundant evidence appears of the presence of Capt. Carter in New York, upon monthly visits which coincide in date with those of Greene and Gaynor, and of his intimate relations with Westcott—both before and after the death of Mrs. Carter, daughter of Westcott, who died in December, 1892, leaving no child—including attention to large financial interests of Westcott in 1895, under power of attorney, while the latter was absent in Europe. It does not appear, however, that Carter took part in or was present at any of the divisions referred to between the contractors and Westcott; nor is there any direct evidence that he was informed thereof, or was mentioned or intended in such transactions to be the beneficiary of such shares, unless an offer on behalf of the United States of purported testimony by Westcott (since deceased) as a witness for the government in extradition proceedings against Greene and Gaynor—in a record stipulated in evidence in other respects—is admissible to that end. Whether the objection raised on behalf of Capt. Carter in the first instance to this offer was not waived by counsel in a subsequent consent to its consideration by the trial court is not free from doubt. As Capt. Carter was not a party to such proceeding, however, we believe this testimony of Westcott to be inadmissible against him upon the issue referred to. It is, therefore, excluded from the present inquiry, while reserved for later consideration by way of notice to the defendants I. S. Carter and L. D. Carter, under admissions of record on their part.

We concur, therefore, in the view expressed in the opinion filed by the trial judge that the charge of conspiracy between Capt. Carter and the contractors to defraud the United States, under the contracts referred to, is (a) neither established by direct evidence; (b) nor can such charge be upheld under the testimony alone of methods adopted in making specifications, advertising for bids, treatment of proposed bidders, or letting contracts; (c) nor under one or the other several branches of testimony reviewed in the opinion, considered independently of the entire chain of circumstances. But these conclusions are not the tests of sufficiency of the entire chain of circumstantial evidence to sustain that charge. While the fact is established, as there

stated, "that a great wrong was practiced in this raid upon the government," we are not satisfied that the right of the United States "to a decree awarding to it" all property in question "arising from funds made up of profits realized by the contractors" therein may rightly rest, as there stated, upon the proposition that Carter must "as a conclusion of law be held chargeable with knowledge of what was being done in the premises."

Under the settled facts above recited, however, linked with cumulative evidence tending to prove actual knowledge on the part of Capt. Carter of the excessive profit in the mattress work and of divisions thereof with Westcott in New York, and complicity in the fraudulent transactions, of which (at one time or another) he acquired approximately one-third of the net proceeds, we are constrained to the belief that the evidence is decisive, not only of fraud perpetrated by the contractors, but of concurrence and participation therein by Capt. Carter. Whether the parties conspired to that end at or prior to the letting of the contract of 1892 can neither be ascertained from the testimony, nor is such inquiry deemed material upon the issue. With the completion of the mattress work expressly stipulated in that contract, it cannot be doubted under the testimony that Capt. Carter, having personal supervision of the work, as an engineer of great experience and ability in harbor improvements, must have discovered the exorbitant profit afforded at the contract price of mattresses, measured by the square yard. Assuming, therefore, that the terms contracted for were fairly obtained and believed by him to be reasonable when made, and that the discretion vested in the officer in charge was rightly exercised in greatly extending mattress work, instead of carrying out the plan of widening the channel by dredging (as let to another contractor) and of stone work (embraced in the Greene and Gaynor contract), no just ground appears for continuing the same terms, for such extension from 350,-000 to 1,363,372 square yards, yielding to the favored contractors another great ratio of excessive profit, if the unreasonableness of the contract terms was then understood, or was readily ascertainable under the circumstances. This transaction, moreover, was followed up by the succession of contracts in evidence for other improvements in the district of like nature, under the same form of specification and advertisement for bids, to cover alternative structures at a single price as ordered: so that no bid was entertainable for the mattress work alone, which was intended and used in the improvement, nor was the "multiple mat" structure (as used) mentioned in either notice, and all were obtained by Greene and Gaynor. All were carried out, measured, and accepted alike with the earlier contract work, up to the appointment of a successor to Capt. Carter. The fact alone of successive contracts thus let to these contractors, at prices far beyond the reasonable value of brush mattresses, whereby the United States was plainly defrauded in overpayments approximating $2,000,000, without proof of tenable excuse for the letting through emergency or other cause, implies either participation in benefits or collusion on the part of the officer having direction of the work. As the evidence further establishes, not only personal and business intimacy between Capt. Carter and these contractors, but his constant presence with them in

New York upon the monthly visits to settle accounts and divide the proceeds between the contractors and Westcott as before stated, together with the cogent fact that Carter acquired the share of illicit profits turned over to Westcott, we believe the inference of fact to be inevitable that Capt. Carter connived with these parties in thus defrauding the United States. The question whether the relation of Westcott in these divisions was one of partnership in the contracts (as stated in the opinion below and contended in the argument of counsel for Carter on these appeals), or was that of a mere representative of Carter therein (as counsel for the government contends), may not be clear under the testimony; but neither contention requires discussion or solution under the foregoing view, for the reason that Carter is equally subject to the relief sought in this bill, whatever may be the actual relation of Westcott to either of such parties in the transactions.

The bill is voluminous—necessarily so in the light of the array of circumstances involved for equitable relief—and both bill and decree rest upon the well-settled principle of equity that property so obtained by Carter, in fraud of the United States, becomes trust property in favor of the defrauded party, which may be followed up and recovered, whether preserved in its original form or in substituted property. May v. Le Claire, 11 Wall. 217, 236, 20 L. Ed. 50. The testimony is convincing, if not substantially uncontroverted, that the share acquired by Carter from or through the divisions between the contractors and Westcott exceeded the entire amount of property and securities traced to the possession of Carter and impounded in this suit under the several bills; that the major portion of the property in the custody of the court is identified as directly derived from shares of proceeds so obtained, and constitutes the portion scheduled in the decree as a trust fund belonging to the United States, and thus awarded to it; and that Capt. Carter has expended and used from funds and securities in his possession, after so obtaining the share of fraudulent proceeds above stated, large amounts of money, greatly exceeding in the aggregate any amounts which can be assumed to be derived by Carter from other sources, under the most favorable view of his testimony in respect thereof. The provision of the decree, therefore, which awards to the United States the property and securities in custody which are above referred to as directly traced to the proceeds of the fraudulent transactions constituting a trust fund, is well supported by the testimony, as we believe, and will be affirmed accordingly.

Another provision of the decree, however, adjudicates that other securities and stocks, specified in a paragraph marked "2," were "not purchased with said trust fund, but with the private funds of Robert F. Westcott and Oberlin M. Carter," and awards such residue to Capt. Carter as not subject to the trust. We believe this provision to be erroneous, irrespective of the contentions on behalf of the government that these investments are otherwise fairly traced to the trust fund, either directly or indirectly, or by way of substitution in fact. Under the circumstances above recited, with the mass of investments coming to his hands (from whatever source) intermingled and secreted by Carter, asserting title as an entirety, we are of opinion that

the elementary doctrine of equity requires that his personal expenditures from the mass be made chargeable against any portion which may be his own; that he cannot be permitted (as sought through his testimony in this case) to segregate a portion from the residue, to be awarded to him as free from the trust, and thus impose the burden of all expenditures so made upon the trust fund; and that, for all purposes of the decree, all the property and securities (in custody) therein described are within the trust, either as original or substitute investments from the trust funds. So the decree must be corrected in respect to such provision, and award title to the securities and stocks mentioned to the United States, without award of any part or portion to Carter.

2. The decree denies the complainant a deficiency decree against the defendant Oberlin M. Carter, upon its election to take such judgment for proceeds of the trust fund which was "dissipated by Oberlin M. Carter and his agents prior to November 6, 1901," as established by the evidence. Upon this denial error is assigned by the appellant, United States (sixteenth assignment), and we disregard the order of the several provisions and assignments to consider the question thus raised as next in sequence. It does not appear upon what theory this election and motion was denied, nor is any tenable ground suggested therefor in the argument of counsel for appellees. The facts and items upon which the motion rests are undisputed, and it is unquestionable that the equitable relief may be thus extended where trust funds have been dissipated. The limitation named (November 6, 1901) for such charge appears to be predicated on a stipulation of that date, entered into between the parties, which embraces allowances to be made from the funds in court, pending final hearing, and thus resolves any possible doubt in reference to ultimate liability for such expenditures in favor of the defendants. For the amount of such deficiency judgment, the items of conversions from the trust property aggregate $105,019.66, as scheduled from the evidence. In view, however, of the above-mentioned finding by the trial court that the securities set apart to Capt. Carter in paragraph 2 of the decree were not derived from the fraudulent transactions, and of our conclusions (as above stated) that such securities are, nevertheless, subject to the trust, as substitutes for securities dissipated, their face value (as scheduled) should be deducted from the above-mentioned aggregate, to ascertain the amount of the deficiency judgment. The decree will be corrected to grant a judgment for deficiency so ascertained.

3. The several provisions of the decree respecting the defendants Lorenzo D. Carter and I. Stanton Carter next arise for review, and, being of like class, are grouped for consideration. Those provisions upon which the appellant, United States, assigns error are: (1) Denial of a deficiency judgment against L. D. Carter; (2) adjudication against I. Stanton Carter for $11,454.18, as the amount of trust funds in his hands not accounted for—and these in turn rest upon findings of a master (on reference of special issues involved in their possession of securities), and exceptions overruled, upon which various errors are assigned, for allowances made to these defendants for expenses and services. The relations of I. S. Carter and L. D. Carter

to the controversy may be briefly stated: They were brothers of Capt. Carter, and received from him the property in suit, for care and safe-keeping, pending the various proceedings against him, and were assiduous in its concealment and withholding from the complainant, until accounting and surrender were required under the present proceedings. It appears, not only from numerous circumstances in evidence, but through their admissions of record, that they were well advised of the charges against Capt. Carter of complicity with Greene and Gaynor (which were widely published), and as well of the testimony of Westcott (hereinbefore referred to) in the Greene and Gaynor proceedings, in effect that Capt. Carter was at all times the actual party in interest, and merely represented by Westcott in the transactions with Greene and Gaynor and in investments of the proceeds. I. S. Carter received and secreted in various places the larger part of the securities, about $350,000 face value, while L. D. Carter received the residue of trust property. In answer to a rule of contempt entered against them, each denied either possession or control of such property; but each subsequently made confessions and entered into an accounting before the master, pursuant to a stipulation between all parties to the bill, dated November 6, 1901. The property and securities described in the decree came into the custody of the court through this source.

(1) The errors assigned for denial of a deficiency judgment against L. D. Carter are, in substance, that he failed to pay over trust funds traced to his possession and admitted by him as received, and that he was relieved from accountability therefor by allowances for expenses and services, which are alleged to be inequitable under the circumstances disclosed. The credits referred to are (a) for various claims for expenses incurred, aggregating $2,379.43 in excess of undisputed expenses, which are complained of as excessive and unsupported by credible testimony; and (b) an allowance of $12,916.66 for salary claimed due from Capt. Carter for services as attorney in fact, under an agreement for $10,000 per annum. Upon the objections raised to items of expense allowed, we believe the findings of the master, approved by the trial court, should not be disturbed, as the stipulation (November 6, 1901) between the parties reserved for allowance assets theretofore "bona fide disposed of" by the agent. The credit for salary, however, is neither justly charged to the property thus withheld nor within the fair meaning of the stipulation, and, whatever may have been the agreement between the parties to the fraud, we are of opinion that error is well assigned for such allowance. The decree, therefore, must be corrected accordingly to adjudge recovery against the defendant L. D. Carter for $12,916.66 of trust fund not accounted for.

(2) The decree awards recovery against I. S. Carter for $11,454.18, as the balance of trust fund traced to his possession and reported by the master, not accounted for or paid over; and on behalf of the appellant, United States, error is assigned for insufficiency of this award, upon various credits allowed by the master, and approved by the trial court, for expenses and salary. As the sum of $6,750 was allowed to this defendant by way of salary, the credit accordingly was erron-

eous under the above-stated view in reference to like allowance in favor of L. D. Carter; but the other objections are overruled, as within the doctrine there stated in respect of the findings of fact. The decree, therefore, must be corrected to make this deficiency award $18,204.18.

4. The remaining assignments of error on the part of the United States relate to allowances made in the final decree for counsel services and other expenses incurred by the defendants under the stipulation entered into November 6, 1901, heretofore mentioned. That ample provision for defraying such expenses out of the fund in court was intended and authorized by the stipulation referred to plainly appears from its terms and is conceded; and the time, skill, and expenditures involved in the services of counsel for which the allowances were granted are neither disputed nor questionable in the light of the record. The only objection raised to either of the provisions for such counsel is that each is excessive. We are of opinion, however, that no abuse of discretion appears in the liberal awards made by the decree, within the purpose of the stipulation, and that no other reviewable question arises under these assignments.

The cross-appeals raised no question not passed upon in the foregoing opinion in reference to the appeal and errors assigned on behalf of the United States, and we are satisfied that neither cross-appellant has just ground to complain of the decree.

The decree of the Circuit Court is affirmed in respect of all provisions thereof not expressly mentioned in the foregoing opinion for correction, and the cause is remanded, with directions to correct the decree in the provisions so mentioned in conformity with this opinion.